UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RADIANCE ALUMINUM FENCE, INC.,

                    Plaintiff and Counter-Defendant,        Case Number 18-12605

v.                                                      Honorable David M. Lawson

MARQUIS METAL MATERIAL, INC.,

                    Defendant and Counter-Plaintiff.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT, AND DENYNG PLANTIFF'S
MOTION AND AMENDED MOTION TO STRIKE**

Plaintiff Radiance Aluminum Fence, Inc., as its business name implies, sells and installs aluminum fence materials on a wholesale and retail basis.  It has developed a unique fence rail, which it markets to other installers and consumers.  Defendant Marquis Metal Material, Inc. imported aluminum fence components from overseas mills and supplied Radiance with aluminum products, including its specially manufactured aluminum rail.  Radiance brought this action against Marquis, alleging that it breached its contract to deliver aluminum during May and June 2017 and in the first quarter of 2018, which "eviscerated" the plaintiff's business.  Marquis responded with a straight-forward explanation: it stopped shipping product because Radiance stopped paying for it, and then resumed shipments when Radiance made payments to bring its account within prearranged credit limits, all as set out in Marquis's counterclaim.  Radiance now contends that the non-payment argument is a ruse to cover up Marquis's problems securing product from an aluminum mill in Asia, which is the true reason for its delayed deliveries.

Both sides have moved for summary judgment.  And they both offer competing interpretations of the facts.  One thing is certain: Radiance did not pay for the initial three

shipments on time, and Marquis entertained doubts that it would be able to do so.  Any fact disputes that remain are not material, and the evidence conclusively demonstrates that Radiance's breach of contract claim is meritless for two reasons: first, Radiance accepted each allegedly nonconforming (i.e., late) delivery without any reservations and therefore did not adequately notify Marquis that it believed Marquis breached the contract; second, Radiance fell behind on its payments, absolving Marquis of its obligation to deliver the aluminum.  The record also reflects that Radiance failed to pay the full price for Marquis's last delivery and refused to provide adequate assurances that it would, entitling Marquis to damages under the contract.  Therefore, the plaintiff's motion for summary judgment will be denied and the defendant's motion for partial summary judgment will be granted.

## I. Facts and Proceedings

The parties' business relationship began in 2015, when Marquis agreed to sell aluminum to Radiance on credit, based on a credit agreement signed in December 2015 by Radiance's owner, Matthew Isaacs.  Isaacs dealt primarily with Marquis's sales representative, Michael Falconer.  It appears that Marquis approved a $200,000 credit limit at the time, but it was increased to $300,000 in July 2017.  Radiance says that its initial credit limit was $300,000, and the record contains some support for that position.  Marquis did not have a formal credit department; rather, it acquired insurance policies to cover any potential failure to pay by Radiance (and its other customers) and allowed Radiance to buy aluminum from Marquis on credit up to the approved credit limit.  A series of purchase orders beginning in 2016 followed.

Isaacs understood that the terms and conditions and the credit agreement applied to all of his orders.  Each purchase was subject to two conditions: the status of past paid invoices and the

available credit limit at the time of delivery.  Operating under the credit agreement, Radiance never paid cash on delivery.

### A.  Blanket Order

The agreement at the center of this case took shape through a series of documents and emails, ultimately resulting in a blanket order for 400,000 to 500,000 pounds of aluminum to be delivered in 13 installments throughout 2017.  Each shipment would come in a "container," which held various quantities of fence stock (posts, pickets, and rails), and delivery would be spaced approximately three weeks apart.  The price was $.71 per pound, a figure established by the London Metal Exchange (LME), throughout 2017.

A sales order was submitted by Marquis and approved by Isaacs on behalf of Radiance on November 9, 2016.  *See* ECF No. 63-9.  The order called for delivery to start March 1, 2017, with one container delivered every three weeks for a total of 13 containers.  The payment terms recited on the order form were "Net 30 day(s)," but an email exchange that preceded the order established a price of ".71$/lb to lock for one year, with *45 days* payment credit."  ECF No. 63-8 (emphasis added).  The parties agree that the initial payment terms required payment within 45 days, not 30 days.

### B.  Course of Performance

From the outset, performance of the agreement varied substantially from its terms.  Although the agreement required Radiance to pay within 45 days of each delivery, the parties occasionally modified that condition to give Radiance more time to pay when it was unable to meet the 45-day term.  In fact, Radiance missed every payment due date for the aluminum that Marquis delivered — even the extended due dates.

Radiance asserts that Marquis agreed to a more generous oral modification of the payment terms, under which all Radiance had to do was make one container payment per month to receive future container deliveries.  Other than Isaacs's own self-serving statement, however, there is no evidence in the record to support that allegation.

### 1.  March – April 2017

Radiance altered the delivery schedule before Marquis delivered the first container by requesting that Marquis delay the shipment from March 1, 2017, to April 1, 2017.  Marquis partially accommodated the request, delivering the container on March 14, 2017.  Marquis delivered the next two containers on nearly three-week intervals, on April 6 and April 28.

### 2.  May – June 2017

By May 2017, Marquis delivered three containers, but Radiance had not paid for any of them.  The parties dispute what happened next.

Marquis contends that it withheld the next installment delivery because Radiance exceeded its credit limit by $90,718.03 and failed to pay for the previous three deliveries.  Radiance acknowledges that it had not paid for the previous three shipments, but it insists that it did not exceed its line of credit at the time.  Pointing to an email from Helen Lu, Marquis's head of accounting, Radiance contends that Marquis increased Radiance's credit limit to $500,000 on January 13, 2017.  If that were true, Radiance calculated that it had $9,281.91 of unused credit remaining on its line by April 28, 2017.  But Radiance misreads the record.  There is some evidence that Marquis established an initial credit limit of $300,000, and it is undisputed that it agreed to increase Radiance's initial credit authorization to that amount in July 2017.  Marquis concedes that Radiance's coverage under Marquis's insurance policy was increased from $300,000 to $500,000 on January 13, 2017.  But there is no evidence of a corresponding increase in Radiance's line of

credit.   And it is undisputed that Marquis subsequently changed insurance providers from "Atradius" to "EDC," resulting in a decrease in Marquis's coverage on the Radiance account from $500,000 to $200,000, because "Atradius could no longer cover the exceedingly long payment terms that were necessary to accommodate Radiance."   ECF No. 120, PageID.4099; EDC Policy, ECF No. 120-1.   Marquis never alleged when exactly this occurred, but asserted that by July 7, 2017, it secured an increase to $300,000 in its policy limit as to Radiance, when the credit line was increased to that amount.

Radiance also contends that Marquis had no product to deliver from its allegedly unreliable supplier, Global Vietnam Aluminum (GVA), and could not ship any aluminum to Radiance during May and June 2017.   The record is unclear on that point.   There are internal Marquis emails expressing a "need" for a "solid backup supplier," and consideration of "mov[ing] some production to another mill."); Wang Email to Falconer, 11/29/17, ECF No. 115-4, PageID.4003. And Radiance furnished email exchanges between Falconer and Lu discussing the facts of this lawsuit (apparently produced mistakenly by the defendant and subject to a claw back provision) speculating about the reason for the delay in shipments during May and June 2017.   However, the record is uncontradicted on the point that Marquis had secured contracts with the mill in December 2016 for the containers that were to be delivered in May and June, and that those shipments were imported in mid-June and July.   And there is a suggestion in the record that Marquis asked that the shipments — which were ready for export from Asia in March and early May 2017 — be delayed because of storage problems that would be caused by not delivering the product to Radiance when it was not able to pay for it.   *See* Falconer Email to Wang, 4/5/2017, ECF No. 72-7, PageID.1951 ("Be aware, Matt [Isaacs] said after the delivery this week it will be unlikely that the next one can be in 3 weeks.   He like Royal will be 'stuffed to the gills', I.e. No room!").

That, however, is beside the point.  The record reflects that Radiance requested that Marquis hold off its May and June deliveries.  *See* Falconer Email to Wang, 4/5/2017, ECF No. 72-7, PageID.1951; Lu Email, 6/25/19, ECF No. 66-14, PageID.1855 ("Did Radiance told you they want a little bit later delivery? from payment history it seems Radiance knew they may have difficulty to pay on time, it maybe Radiance actively ask late delivery to avoid extra late payment [sic].") (subject to claw back dispute); Isaacs Email to Falconer 6/30/2017, ECF No. 63-12, PageID.1252 ("don't deliver [the shipment] til I come up with another payment then . . . It'll be a couple weeks . . . I don't like being threatened that I can't get a delivery"); Isaacs Email to Falconer 7/6/2017, ECF No. 63-12, PageID.1251 ("I can't pay what I don't have (have it in receivables just waiting on customers to pay) . . . I think we should seriously consider stopping the program as my customers just aren't paying me in a reasonable time frame enough for Marquis, we're just now starting to get really busy . . . I can't handle the stress of the money situation anymore.").

And when asked at his deposition whether he can "identify any month at all in 2017 when Radiance was asking for a container of material that Marquis didn't have available to deliver," Isaacs responded, "no, I can't."  Isaacs Dep., ECF No. 66-7, PageID.1638.  Falconer corroborated this account during his deposition as well:

> Q: [I]n all of the instances where Radiance was late on their payment, did Mr. Isaacs ever ask for metal to still be delivered?
> A: No, he was always fully understanding that we would not deliver metal until his past due invoices were paid up . . . .
> . . .
> Q:  Let's assume hypothetically . . . that Helen [Lu] . . . was indicating that the shipment between May and June was withheld for some reason other than the credit limit or the delay in payment.  Under that hypothetical, are you aware, as you sit here today, of any other reason why those shipments in May and June would not have been made to Radiance?
> A: I am not.

Falconer Dep., ECF No. 66-11, PageID.1815-16; *Id.* ECF No. 79-7, PageID.2525

### 3. July – November 2017

While Marquis was waiting for Radiance to pay for the first container, Marquis arranged for more shipments from GVA.  GVA produced the next shipment on March 22, 2017, shipped it out on May 22, and it arrived on June 19.  Three days later (on June 22, 2017), Radiance paid Marquis $73,250.59 for the first container.  Marquis then resumed shipments, delivering another container to Radiance on July 5, 2017.  Once deliveries resumed in early July 2017, Radiance delivered the next three shipments with no delay.  A total of seven containers had been delivered by September 27, 2017.

But by October 2017, Radiance had again fallen behind on payments.  Although the plaintiff had not exceeded its credit limit (according to Marquis), its unused credit line balance hovered around $975, and payments were delinquent well beyond 45 days.  Isaacs emailed Marquis, telling it that, "I'm fully aware of the 3 invoices I owe . . . I certainly don't expect you guys to ship anything until I'm current."  Isaacs Email to Wang 10/25/17, ECF No. 61-4.  However, Marquis already had authorized the shipment of containers of aluminum from GVA (under its December 2016 contract), so it placed them in a storage facility in Romulus, Michigan.  In late November 2017, Falconer wrote Isaacs, explaining that "[i]t seems that the storage fees are going through the roof at the warehouse in Romulus," and asked whether Isaacs could "help [them] by taking a container."  Falconer Email to Isaacs 11/28/17, ECF No. 61-5.  According to Falconer's email, the storage costs increased by $15 per metric ton every two weeks: Marquis incurred $660 for the first month, $1,320 for the second month, and $1,980 for the third month.  *Ibid.*  Marquis delivered the eighth container on December 26, 2017.

C.  International Complications, Price Negotiations, and Fall Out

When the parties' business relationship began, Marquis procured its aluminum from its Vietnamese supplier, GVA.  But in early 2018, the United States Department of Commerce began investigating all aluminum imports from Vietnam, suspecting that China was unlawfully shipping aluminum to Vietnam to avoid tariffs imposed under Section 232 of the Trade Expansion Act of 1962.  *See* Office of Public Affairs, Secretary Ross Releases Steel and Aluminum 232 Reports in Coordination with White House (Feb. 16, 2018), https://www.commerce.gov/news/press-releases/2018/02/secretary-ross-releases-steel-and-aluminum-232-reports-coordination.      That action resulted in a 23.6% tariff on all aluminum imports from Vietnam, beginning in February 2018.  *Ibid.*

The change in international trade policy caused Marquis to import the remaining Radiance containers all at once by January 31, 2018 and store them to avoid the increased tariffs. Discussions then ensued on whether the $.71/lb. LME price would be carried over to 2018 and who would pay to store the remaining containers, since Radiance would not be ready to receive deliveries until the 2018 fence season became active.  The parties agreed to increase the price for the aluminum shipped in 2018 from $.71 to $.96 per pound.  Isaacs Dep., ECF No. 63-3, PageID.1142-43, 1155-56, 1177-78; Emails Between Isaacs and Marquis, ECF No. 63-14, PageID.1263-64; Falconer Dep., ECF No. 63-16, PageID.1278, 1280-84.  The parties also agreed that Marquis would not charge Radiance for storing the containers until the demand increased for the 2018 fence sales season.  Radiance contends, though, that Marquis offered to cover the storage fees indefinitely.

Only one container — the ninth of the original thirteen containers — was delivered to Radiance under the revised price.  Marquis delivered and Radiance accepted the shipment on

March 7, 2018.  The invoice amount — in invoice #236 — was $84,511.50 (which did not include storage costs).

The parties' relationship ended in July 2018 when Radiance did not pay the remaining $11,000.40 billed under invoice #236.  At that time, four containers remained for delivery under the contract, which Marquis had acquired and stored in Romulus, Michigan.  Isaacs had inquired in June 2018 when the next container would be delivered.  Helen Lu responded that Marquis would ship when Radiance paid its past-due invoice for the ninth delivery, which remained outstanding. Isaacs sent a check later that month for about half the balance, and then another in July, for a total of $73,510.80, leaving a balance of $11,000.40.  Isaacs annotated the second check with a note stating that it represented "payment in full," despite his earlier acknowledgements of the price change.  Isaacs offered to pay the balance, but it was conditioned on Marquis agreeing to a mutual release of all claims, which would have absolved Radiance of any obligation for storage fees.

The balance on invoice #236 still remains unpaid.  Marquis did not deliver the remaining containers.  It says that it is still paying storage fees on aluminum products that the plaintiff ordered but for which it has not yet paid.

### C.  Proceedings

Radiance commenced this action against Marquis on August 21, 2018, alleging that Marquis breached its contract for the purchase and delivery of aluminum by not making timely deliveries in May and June 2017, failing to deliver the last five containers, and "unilaterally" raising the price of aluminum from $.71 to $.96 per pound.  Radiance says it incurred damages, including lost sales, lost customers, lost value to the brand name and goodwill, and expenses incurred to cover the aluminum stock obtained from another supplier at a higher price.

Marquis alleged in its answer that Radiance breached the contract first by not tendering timely payment and therefore cannot maintain its own action for breach of contract.  It also contends that Radiance continued to accept deliveries of the goods without protest and therefore waived any claim for untimely deliveries.  Marquis also filed a counterclaim, alleging that Radiance breached the contract and was unjustly enriched by failing to make timely payments for the shipped containers.  It seeks damages for the storage fees and the unpaid balance on invoice #236.

After discovery closed, both sides moved for summary judgment.

## II.  Discussion

The fact that the parties have filed cross-motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute.  *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate.").  Instead, the Court must apply the well-recognized summary judgment standard when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."  *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th

Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  Instead, that party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for" that party. *Anderson*, 477 U.S. at 252.  If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The party who bears the burden of proof must present a jury question as to each element of its claim. *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir. 2000).  Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889, 895 (6th Cir. 1991).  It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable

inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003) (quoting *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.,* 305 F.3d 498, 505 (6th Cir. 2002)).

This case is here under the Court's diversity jurisdiction, so the Court must "apply the same law that [the] state courts would apply." *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018) (citing *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). That law usually comes from the state's highest court. *Auburn Sales, Inc.*, 898 F.3d at 715. "And where [the state's intermediate] appellate courts have spoken in the Supreme Court's absence, we will normally treat those decisions as authoritative absent a strong showing that the [state's Supreme Court] would decide the issue differently." *Ibid.* (quotation marks omitted). "In this latter scenario, we must also look to other available data, such as Restatements, treatises, law reviews, jury instructions, and any majority rule among other states." *Ibid.* The parties agree that Michigan law governs.

A. Claim for Non-delivery in May and June 2017

Each side accuses the other of breaching the contract first, and each side argues that the other's initial breach disqualifies it from enforcing the contract terms. Both cite (mostly) the same law in support of their respective positions.

Michigan's version of Article 2 of the Uniform Commercial Code (UCC), Mich. Comp. Laws §§ 440.2101-.2725, "governs the relationship between parties involved in contracts for the sale of goods." *Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC*, 317 Mich. App. 395, 400, 894 N.W.2d 700, 703 (2016) (citing Mich. Comp. Laws § 440.2102).

To state a claim for breach of contract under Michigan law, a plaintiff (or a counter-plaintiff) first must establish the elements of a valid contract. *Pawlak v. Redox Corp.*, 182 Mich.

App. 758, 765, 453, N.W.2d 304, 307 (1990).  The elements of a valid contract in Michigan are

"'(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4)

mutuality of agreement, and (5) mutuality of obligation.'"  *Hergenreder v. Bickford Senior Living

Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011) (quoting *Hess v. Cannon Twp.*, 265 Mich. App. 582,

696 N.W.2d 742, 748 (2005)).  Once a valid contract has been established, the plaintiff then must

prove (1) the terms of the contract, (2) breach of those terms by the defendant, and (3) injury to

the plaintiff resulting from the breach.  *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003); *see also

May v. CitiMortgage, Inc.*, 648 F. App'x 567, 571 (6th Cir. 2016)).

Neither side contests that a contract was formed, but they dispute the terms, and even which

writings form the agreement.  As adopted in Michigan, the UCC permits a contract for the sale of

goods to be formed "in any manner sufficient to show agreement, including conduct by both parties

which recognizes the existence of such a contract."  Mich. Comp. Laws § 440.2204(1).  No single

document is required.   The broad language of the Michigan statute contemplates contract

formation in a variety of circumstances. When interpreting section 440.2204 and the UCC,

Michigan and other courts have found that the exchange of documents and emails can give rise to

an enforceable agreement.  *See Michigan Reg'l Council of Carpenters v. New Century Bancorp,

Inc.,* 99 Fed. Appx. 15, 22 (6th Cir. 2004) (enforcing a settlement agreement that was accepted by

an email); *Lamble v. Mattel, Inc.*, 394 F.3d 1355, 1361 (Fed. Cir. 2005); *Cloud v. Hasbro, Inc.,*

314 F.3d 289 (7th Cir. 2002); *Clark v. Coats & Suits Unlimited,* 135 Mich. App. 87, 98, 352

N.W.2d 349, 354 (1984).

Radiance focuses almost exclusively on the sales order (ECF No. 63-9) as the sole writing

that establishes the parties' agreement.  But that document does not contain all the terms it seeks

to enforce (the price term, for example), and it contains terms that are inconsistent with other

writings and the parties' course of dealing (the "Net 30 day(s)" payment term).  Marquis contends that the relevant contract documents include the September 14, 2016 emails among Matt Isaacs, Michael Falconer, Claire Zhao, and Hamish Wang (ECF Nos. 63-7, 63-8); the sales order; and the credit application (ECF No. 63-2).  Isaacs acknowledged that those documents together contained the terms of the agreement.  Isaacs dep., ECF No. 63-3, PageID.1154.  And that position is supported by evidence of the parties' performance.  None of the shipments were cash sales and all depended on Marquis extending credit to Radiance.  The price and payment terms as understood were not found in the sales order.  And the delivery schedule was not written in the emails.  However, when read together, those documents evidence the mutual understanding of the parties.

In addition, UCC section 2–208 states that "any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement."  Mich. Comp. Laws § 440.2208(1).  That section also creates "a hierarchy of evidence" that establishes contract terms when performance is inconsistent with other proof, under which express contract provisions prevail over course of performance, which in turn prevails over custom and usage and trade practices.  *See Iverson Indus., Inc. v. Metal Mgmt. Ohio, Inc.*, 525 F. Supp. 2d 911, 917 (E.D. Mich. 2007); Mich. Comp. Laws § 440.2208(2) (stating that "[t]he express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (section 1205)").  The parties' performance at the outset of the installment contract was consistent with the expressed understanding that deliveries would be made every three weeks (starting March 1, 2017), the price

-14-

would be based on $.71 per pound LME, credit would be extended up to the approved limit, and remittance would occur within 45 days.

The contract required Marquis to deliver the first of thirteen containers on March 1, 2017, and a container every three weeks thereafter. The first container was not delivered until March 14, 2017, but the uncontroverted evidence shows that the delayed delivery was requested by Radiance. The next two deliveries followed the scheduled interval, and Radiance accepted the deliveries without protest or objection. The delivery dates, at least for the first three containers, were modified by the parties' agreed performance. The "course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." Mich. Comp. Laws § 440.2208(3).

Radiance says that Marquis breached the contract by not delivering any containers in May and June 2017, instead making the deliveries in July and August. There are several reasons why the record does not support that argument.

First, the undisputed facts show that Radiance failed to pay for any of the first three deliveries in accordance with the contract terms, which amounted to an antecedent breach that excused Marquis's performance. Under Michigan law, the "one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Flamm v. Scherer*, 40 Mich. App. 1, 8-9, 198 N.W.2d 702, 706 (1972). This rule applies when the initial breach was "substantial." *Baith v. Knapp-Stiles, Inc.*, 380 Mich. 119, 126, 156 N.W.2d 575 (1968). "A 'substantial breach' is one 'where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party.'" *Jawad v. Hudson City*

-15-

*Sav. Bank*, 636 F. App'x 319, 322 (6th Cir. 2016) (quoting *McCarty v. Mercury Metalcraft Co.*, 372 Mich. 567, 127 N.W.2d 340, 343 (1964)).  Failure to pay for goods sold and delivered is a clear breach of the contract.  *Fisher Sand & Gravel Co. v. Neal A. Sweebe, Inc.*, 494 Mich. 543, 568, 837 N.W.2d 244, 259 (2013).

Radiance accepted the containers, and therefore it was required to pay the contract price. Mich. Comp. Laws § 440.2607(1) ("The buyer must pay at the contract rate for any goods accepted.").  But when it came time for the fourth delivery, Radiance had not paid for any of the first three shipments.  The parties apparently agreed to extend the payment due date for the first container to 75 days, and to 105 days for the third.  Even with that accommodation, no payment was made on the first order until the end of June, and payment for the third container was made on August 28, 2017.  That nonpayment amounts to a failure of consideration.  In light of those delinquencies, no reasonable person would expect Marquis to make more deliveries without seeing any effort to pay for goods already shipped and received, not even Isaacs.  *See* Isaacs Email to Falconer 6/30/2017, ECF No. 63-12, PageID.1252 ("don't deliver [the shipment] til I come up with another payment then . . . It'll be a couple weeks . . . I don't like being threatened that I can't get a delivery."); Isaacs Email to Falconer 7/6/2017, ECF No.63-12, PageID.1251 ("I can't pay what I don't have (have it in receivables just waiting on customers to pay) . . . I think we should seriously consider stopping the program as my customers just aren't paying me in a reasonable time frame enough for Marquis, we're just now starting to get really busy . . . I can't handle the stress of the money situation anymore.").

The failure to pay under an installment contract constitutes a substantial breach of contract. *Wolverine Packing Co. v. Hawley*, 251 Mich. 215, 219, 231 N.W. 617, 618 (1930) (holding that a party "loses all right to require the further fulfillment of [a] contract" if the party fails to perform

a condition precedent); *Fifth Third Bank v. Danou Tech. Park, LLC,* 2012 WL 933983, at \*10 (Mich. App. Mar. 20, 2012) ("[W]hen a party fails to make payments pursuant to the terms of an installment contract, the nonbreaching party is entitled to rescission of the contract and need not perform its own obligations."). As a matter of law, Radiance's breach excused Marquis's further performance. *Wolverine Packing Co.*, 251 Mich. at 219, 231 N.W. at 619 ("It is a general rule that failure to pay for an installment of a contract commodity on delivery as provided in the contract of sale is sufficient ground for rescission by the vendor.").

Radiance says that the parties agreed orally to modify the payment terms so that all he had to do was make one container payment per month. "Parties to a contract are at liberty to modify or waive the rights and duties established by a contract." *Bank of Am., NA v. First Am. Title Ins. Co.*, 499 Mich. 74, 102, 878 N.W.2d 816, 830 (2016). But any modification must be established by clear and convincing evidence that the parties mutually agreed to the modification. *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 372, 666 N.W.2d 251, 257-58 (2003). The only evidence of this purported modification is Isaacs's deposition testimony, which falls far short of anything that is clear and convincing. Moreover, the contract was subject to the Statute of Frauds. *See* Mich. Comp. Laws § 440.2201 (stating that "a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought"). Therefore, any modification of the contract, especially the payment term, must be in a writing signed by Marquis. Mich. Comp. Laws § 440.2209(3) ("The requirements of the statute of frauds section of this article (section 2201) must be satisfied if the contract as modified is within its provisions."). There is no such writing in any form.

Radiance also argues that Marquis was not prepared to make a May delivery because it did not have product on hand.  Marquis produced documents showing that the mill produced the aluminum for the fourth container on March 22, 2017.  It says that it did not order the boat for shipment from Asia, though, because of doubts about Radiance's ability to pay for the shipment. And Isaacs acknowledged that he could not identify any month at all in 2017 when Radiance had asked for a container of material that Marquis did not have available to deliver.  Isaacs Dep., ECF No. 66-7, PageID.1638.  Those competing contentions create a fact question, but not a material one.  None of that changes the fact that Radiance was the first to breach the contract by not paying for goods.

Second, Radiance's failure to pay for the first three containers caused it to exceed its credit limit even when it was calculated at the $300,000 level.  Unless the May and June deliveries would have been on a cash basis, which no one expected, additional shipments would have put Radiance further in breach of its credit limit.  Isaacs testified that he understood that limitation and the conditions the credit limit imposed on further deliveries.  Isaacs dep. ECF No. 63-3, PageID.1175-76.

Third, Radiance accepted delivery of the fourth, fifth, sixth, seventh and eighth shipments without objection or protest.  If it had objections to a nonconforming delivery, it was obliged "within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."  Mich. Comp. Laws § 440.2607(3)(a).  That notice is required for "any breach," even late deliveries.  *See Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 152 (6th Cir. 1983) (interpreting a notice requirement imposed by the Ohio Commercial Code that is identical to the Michigan provision).  And the notice is required even if the seller is aware of the breach.  *Johnson Controls, Inc. v. Jay Indus., Inc*., 459 F.3d 717, 730 (6th Cir. 2006)

(holding that "'§ 2-607 'mandate[s] notice regardless [of] whether either or both parties had actual knowledge of breach'") (quoting *Standard Alliance Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 825 (6th Cir. 1978)).

Radiance gave no notice at all.  To the contrary, it continued to accept deliveries as long as it could pay for the containers within its credit limit.  The failure to give notice bars its claim for breach of contract based on the non-deliveries in May and June 2017.

### B.  Claim for Non-delivery of Remaining Containers

Radiance also alleges in its amended complaint that Marquis breached the contract by failing to deliver all the containers contemplated by the agreement.  The record shows that Radiance fell behind on payments following a container delivery on September 27, 2017.  Isaacs halted, presumably temporarily, further deliveries at that time.  Isaacs Email to Wang 10/25/17, ECF No. 61-4 ("I'm fully aware of the 3 invoices I owe . . . I certainly don't expect you guys to ship anything until I'm current.").  Marquis delivered a container on December 26, 2017, and another on March 7, 2018.  The March 2018 container was subject to a price increase from $.71/lb. LME to $.96/lb. LME.  The invoice for that delivery was never paid in full, although two partial payments were made in June and July 2018.  Marquis had other containers in storage but did not deliver them to Radiance because it had not made full payment on the March 2018 delivery.

Radiance alleged in its amended complaint that Marquis unilaterally raised the price for product shipped in 2018.  It now contends that Marquis extorted Radiance to pay higher prices for delivering the last five containers in 2018 and withheld the deliveries until the higher prices were paid all at once.  The record does not support that contention.

The foundation of Radiance's argument is its belief that the parties agreed to the price of $.71 LME per pound for an indefinite period of time.  The record does not support this position,

either.  Isaacs's emailed purchase order requested "between 400,000 & 500,000 pounds of aluminum *next year* . . . on the condition the prices remain the same as 2016."  Purchase Order Email, ECF No. 63-7, PageID.1241 (emphasis added). By the terms of Isaacs' own request, the price extended to any purchase made in 2017, as Isaacs sent the email in September 2016. Marquis's acceptance stated that the price was locked in for "one year," not indefinitely.  Marquis Acceptance Email, ECF No. 63-8, PageID.1243.  For contracts between merchants, Michigan law states that once a party makes an offer, any additional terms included in the acceptance of that offer become part of the final agreement unless "(a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."  Mich. Comp. Laws § 440.2207(2).  The two emails, read together, established the price term.  And the subsequent sales order issued by Marquis and signed by Isaacs was consistent with that term because the 13 containers were to be delivered in 2017 — beginning on March 1 and ending on November 21, 2017.  Sales Order, ECF No. 63-9, PageID.1245.  The parties never contracted for an indefinite price lock of $.71/lb. LME.

The factual record also shows without contradiction that, when faced with delivery delays caused by Radiance's payment delinquencies, the parties entered new negotiations to address changing conditions, which they were free to do.  *Bank of America*, 499 Mich. at 102, 878 N.W.2d at 830.  Courts afford parties the flexibility to renegotiate contracts because "they possess, and never cease to possess, the freedom to contract even after original contract has been executed." *Quality Prods.*, 469 Mich. at 372, 666 N.W.2d at 257-58; *see also Reid v. Bradstreet Co.*, 256 Mich. 282, 286, 239 N.W. 509, 511 (1931) (citing *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 388, 122 N.E. 378, 381 (1919)).  And like all contracts, a renegotiated agreement is

enforceable where there is sufficient proof of mutuality of intention to change an earlier agreement. *Quality Products*, 469 Mich. at 372, 666 N.W.2d at 257-58.

Radiance does not agree that the parties negotiated higher prices for the 2018 deliveries of the final five containers. But the record plainly shows that in early January 2018, Marquis salesman Michael Falconer wrote Isaacs to let him know about the unforeseeable spike in tariffs placed on shipments from Vietnam, and to inform him that he could get the five containers out of Vietnam, but that it had to happen immediately and all at once. Falconer/Isaacs Texts, ECF No. 63-13, PageID.1258-60. Marquis gave Radiance a choice to risk losing the five containers to international sanctions or take them all out in early 2018. *Ibid.* Isaacs responded that he would agree to ship the five containers all at once, so long as he did not have to pay for storage. *Ibid.* The parties then negotiated that the price for the containers to be imported and delivered in 2018 would increase from $.71 to $.96 per unit. Emails Between Isaacs and Marquis, ECF No. 63-14, PageID.1263-64.

Isaacs also testified that he agreed with the negotiated price:

Q: You wanted those containers at the price; right?
A: Yes.
Q: That was a benefit to Radiance; right?
A: Well, I wanted them at the original price, but . . .
Q: Fair play. But even at the inflated price that you agreed to, that was still a good deal for Radiance; right?
A: Yes.
Q: It was something you wanted; right?
A: Yes.
Q: It was better than the alternative market price out there; right?
A: Yes.

Isaacs dep., ECF No. 63-3, PageID.1142-43.

The agreement outlined and recorded in emails between Isaacs and Marquis employees and acknowledged by Isaacs and Falconer in their respective depositions is established by clear and

convincing — and uncontradicted — evidence that the parties modified the price term for the delivery of containers in 2018. *Quality Prods.*, 469 Mich. at 372, 666 N.W.2d at 257-58; Isaacs dep., ECF No. 63-3, PageID.1142-43; Falconer dep., ECF No. 63-16, PageID.1278, 1280-84; Emails Between Isaacs and Marquis, ECF No. 63-14, PageID.1263-64.

That leaves Radiance's claim of breach based on non-delivery of the final containers without factual support in the record. As noted above, Marquis was entitled to withhold further deliveries because of nonpayment of the invoice for the March 2018 shipment. *Wolverine Packing*, 251 Mich. at 219, 231 N.W. at 618. And there is no dispute in the record that at least part of the invoice for that shipment — invoice #236 — remains unpaid.

\* \* \* \* \*

The record does not establish all the elements of the plaintiff's claims as a matter of law, and it has not shown that it is entitled to a judgment as a matter of law on its breach of contract claims. *See Davis*, 226 F.3d at 511. To the contrary, the defendant is entitled to a judgment as a matter of law on its motion for summary judgment seeking dismissal of the amended complaint.

### C. Counterclaim

The flip side of the argument discussed above is Marquis's counterclaim for payment of the balance of the invoice for the March 2018 delivery, and other incidental and consequential damages resulting from Radiance's breach.

Marquis delivered and Radiance accepted the shipment on March 7, 2018, which cost $84,511.50 under the revised pricing agreement. Invoice #236, ECF No. 63-15. By June 2018, Marquis began sending reminder emails to Radiance requesting that it pay invoice #236. Reminder Emails 6/5/18, ECF No. 63-19 PageID.1292. Isaacs responded on June 7, 2017, telling Marquis that he planned to submit two separate payments. *Ibid.* Isaacs subsequently asked when Marquis

-22-

planned to release the next container, to which Marquis replied that it "will release next container after received due inv#236 pmt [sic]."  Isaacs/Lu Emails, ECF No. 63-20, PageID.1294-95. Radiance submitted its first check in the amount of $36,755.40 on June 20, 2018.  Radiance Check #11315, ECF No. 63-17, PageID.1286.

By July 11, 2018, Radiance had still not paid the full balance of invoice #236, and Marquis issued more remainder emails.  Reminder Emails 7/18, ECF No. 63-22, PageID.1299.  Radiance submitted its second check on July 25, 2018.  Combined, the checks were short by $11,000.40. Radiance Checks #11315 and #11402, ECF No. 63-17.  Isaacs admitted that he never paid the remaining balance of $11,000.40 because his lawyer advised him against it.  Isaacs Dep., ECF No.63-3, PageID.1159.

According to Radiance, it need not pay the $11,000.40, which reflects the increased 2018 pricing, because Marquis repudiated the modified contract.  Radiance contends that it only agreed to the increased price on the condition that Marquis would not charge it for storing the materials. Radiance argues that Marquis repudiated the contract by demanding that Radiance pay for the storage of the 2018 shipments.   However, the only evidence that Radiance provided of this alleged breach is Isaacs' testimony: "I got a letter from Helen [Lu] stating what storage fees were."  Isaacs dep., ECF No. 63-3, PageID.1161.  Radiance did not provide any emails, invoices, or written documentation to support the claim that Marquis charged Radiance for storage.  Isaacs testified:

> Q: Did you ever get an invoice for storage?
> A: No.
> Q: As we sit here today you can't point to any document that says you're being charged for storage for that March 7th delivery; true?
> A: That's correct.

*Id.* at PageID.1161-62.  The record establishes that the only reason Radiance did not make the full payment is Isaacs' subjective, and apparently incorrect, belief that Marquis was going to bill

Radiance for the storage.  That is insufficient.  *See Barto v. United States*, 823 F. Supp. 1369, 1376 (E.D. Mich. 1993) (holding that under Michigan law, a purchaser is legally obligated to perform his side of the bargain, notwithstanding his subjective belief regarding excuse of performance).

The record also reflects that it was Radiance who initially breached the contract by failing to make full payment on the invoice.  Upon learning that Radiance was contesting the amount of invoice #236, Marquis demanded adequate assurance that Radiance would pay the full amount for the remaining containers before agreeing to deliver them, which it was entitled to do.  *See* Mich. Comp. Laws § 440.2609 ("After receipt of a justified demand, failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.").  Isaacs ultimately refused to pay the invoice, retained an attorney, and explained that, upon following his attorney's advice, he was withholding the $11,000.40 until Marquis agreed to release any claims against Radiance. Isaacs Email Re: Release of Claims, ECF No. 63-18, PageID.1289-90.  Radiance never fully paid for the shipment, nor did it ever provide adequate assurances that it would; it just sent a demand letter for a release of claims.

Where the buyer of goods first breaches a sales contract by failing to pay, the seller is excused from further performance and may recover the unpaid amounts for the delivered goods. *SSI Tech., Inc. v. Compaero Inc.*, No. 13-12672, 2014 WL 4373660, at *6 (E.D. Mich. Sept. 3, 2014).  Radiance substantially breached the parties' contract by failing to pay within the contract's net 45-day payment terms and by refusing to pay the full amount of invoice #236.  Not only is Radiance barred from any remedy, it is fully liable for not paying the remainder of invoice #236.

The counter-plaintiff's motion for partial summary judgment will be granted.

-24-

III.  Miscellaneous Procedural Motions

The Court heard oral argument on these motions on January 28, 2020.  At the conclusion of the hearing, the Court directed the defendant to file a supplemental brief that annotated a demonstrative exhibit, identified as a payment and delivery chart, *see* ECF No. 63-10, with references to the record that supported the entries on that summary.  Radiance beat Marquis to the punch, however, by filing new evidence to support its motion for summary judgment on February 10, 2020.  ECF No. 111.  The next day, Marquis filed a supplement to its payment and delivery chart, which contained references to the record as well as new exhibits.  ECF No. 113.

Unsurprisingly, the parties bickered over the filings: Radiance filed a motion to strike Marquis's supplement, later amended, because it contained evidence not originally in the record. The motion is remarkable, if only for its boldness, and it is difficult not to question the motives behind this filing.  Radiance fervently argues that Marquis disobeyed the Court's order by filing new exhibits to support the entries on its payment and delivery chart when the Court ordered it only to "mak[e] references to the record."  Tr. ECF No. 115, PageID.3981.  But Radiance makes this argument after filing its own new exhibits one day before Marquis filed its supplement, and without any direction do so from the Court.  What's more, Radiance attached more new exhibits to its motion to strike Marquis's supplement — the same motion that complained of the exact conduct that Radiance itself indulged in.

The defendant's supplemental filing may have provided more information than the Court asked for.  But the additional exhibits all were relevant, and the plaintiff obviously has had the opportunity to respond and enlarge the record itself.  In fact, its motion to strike is not so much a complaint about the state of the record as it is more argument of the plaintiff's summary judgment motion.  The plaintiff mainly spent its energy in its motion to strike supporting its summary

judgment arguments.  It is therefore rather obvious that the plaintiff used the Court's invitation for the defendant to annotate its demonstrative exhibit as an opportunity for the plaintiff to introduce new evidence and refine its summary judgment arguments four months after the dispositive motion deadline.

There is nothing improper in the defendant's supplemental filing.  The Court has discretion to ask that the record be expanded with the products of proper discovery when it needs the information to address the parties' issues.  *See Duncan v. Jackson*, No. 1:03-CV-422, 2006 WL 2385152, at *1 (E.D. Tenn. Aug. 17, 2006).  And the Court may consider any record evidence it chooses when deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

There is no merit to the plaintiff's motion and amended motion to strike, and they will be denied.

### IV.  Conclusion

There is no genuine question of material fact on the question of which party first breached the contract.  It was the plaintiff.  The defendant is entitled to a judgment as a matter of law for dismissal of the amended complaint and partial summary judgment of liability on its counterclaim. The plaintiff's motion and amended motion to strike are meritless.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment (ECF No. 66) is **DENIED**.

It is further **ORDERED** that the defendant's motion for partial summary judgment (ECF No. 63) is **GRANTED**.  The amended complaint is **DISMISSED WITH PREJUDICE**.  The case may proceed to trial on damages on the counterclaim.

It is further **ORDERED** that the plaintiff's motion and amended motion to strike (ECF Nos. 114, 115) are **DENIED**.

s/David M. Lawson_____
DAVID M. LAWSON
United States District Judge

Dated:  May 18, 2020